Marc P. Berger
Lara S. Mehraban
Thomas P. Smith Jr.
Richard Hong
Alix Biel
Attorneys for Plaintiff
SECURITIES AND EXCHANGE COMMISSION
New York Regional Office
200 Vesey Street, Suite 400
New York, New York 10281-1022
(212) 336-0956 (Hong)
Email: hongr@sec.gov

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
------------------------------------------------------------------x

| | | |
|---|---|---|
| **SECURITIES AND EXCHANGE COMMISSION,** | : | 19 Civ. |
| | : | |
| **Plaintiff,** | : | **ECF Case** |
| | : | |
| - against - | : | |
| | : | **COMPLAINT AND JURY** |
| **SAM A. ANTAR,** | : | **DEMAND** |
| | : | |
| **Defendant.** | : | |

------------------------------------------------------------------x

      Plaintiff Securities and Exchange Commission (the "Commission"), for its Complaint against Defendant Sam A. Antar ("Antar" or "Defendant"), alleges as follows:

## SUMMARY

    1.    Between January and June 2019, Antar knowingly or recklessly engaged in a fraudulent scheme that victimized numerous investors, many of whom were friends and acquaintances from the Syrian Jewish community in Monmouth County, New Jersey where he grew up.  Antar stole at least $550,000 from investors and used the money for gambling, making gifts to his family members, paying for his daughter's lavish wedding, and making partial repayments to some of the early investors.

2.      Antar made material misrepresentations to his investors, telling them he would use their funds to buy blocks of shares in emerging companies whose stock had not yet begun trading publicly ("pre-IPO shares").  Antar falsely told investors that he had identified holders of the pre-IPO shares who wanted to sell them, and buyers who would pay a premium for them. Antar falsely told investors he would use their funds to purchase the pre-IPO shares and then quickly sell the shares so that the investors would get their money back plus profits within a few weeks.

3.      In some cases, Antar executed contracts with investors in which investors agreed to loan him funds to purchase pre-IPO shares and he agreed to purchase and then sell the shares and return the investment with a profit.  In other cases, Antar executed agreements to make the investor a partner in his limited liability company, which, he told investors, owned the shares.  In still other cases, Antar executed promissory notes by which investors loaned him money so that he could buy blocks of shares.

4.      Contrary to his written and verbal representations, Antar never used investor money to buy blocks of pre-IPO shares, or make any other investment.  Investors at first received the returns Antar promised and after some investors made additional investments with Antar, at least one of which was based on a falsified document, Antar misappropriated their funds and stopped returning investors' calls and text messages.

## VIOLATIONS

5.      By engaging in the conduct set forth in this Complaint, Antar engaged in securities fraud in violation of Section 17(a) of the Securities Act of 1933  ("Securities Act") [15 U.S.C. § 77q(a)], Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78j(b)], and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

## NATURE OF THE PROCEEDING AND RELIEF SOUGHT

6.      The Commission brings this action pursuant to the authority conferred upon it by Sections 20(b) and 20(d) of the Securities Act [15 U.S.C. § 77t(b) and (d)] and Section 21(d) of the Exchange Act [15 U.S.C. § 78u(d)].

7.      Through this action, the Commission seeks a final judgment: (a) permanently enjoining Antar from engaging in the acts, practices and courses of business alleged herein; (b) ordering Antar to disgorge ill-gotten gains he obtained as a result of the violations alleged in the Complaint, and ordering him to pay prejudgment interest thereon; and (c) imposing a civil money penalty on Antar pursuant to Section 20(d) of the Securities Act [15 U.S.C § 77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)].

## JURISDICTION AND VENUE

8.      This Court has jurisdiction over this action pursuant to Sections 20(b), 20(d), and 22(a) of the Securities Act [15 U.S.C. §§ 77t(b), 77t(d), and 77v(a)] and Sections 21(d), 21(e), and 27 of the Exchange Act [15 U.S.C. §§ 78u(d), 78u(e), and 78aa].

9.      Antar, directly or indirectly, has made use of the means or instruments of transportation or communication in, and the means or instrumentalities of, interstate commerce, or of the mails, in connection with the transactions, acts, practices, and courses of business alleged in this Complaint.

10.     Venue is proper in this District pursuant to Section 22(a) of the Securities Act [15 U.S.C. § 77v(a)] and Section 27 of the Exchange Act [15 U.S.C. § 78aa].  Among other reasons, Antar lives in this District, and while located in the District, he communicated with investors and prospective investors, some of whom also reside in this District.

## DEFENDANT

11.     **Antar**, age 43, was, until December 2018, a marketing representative for an affiliate of a Middletown, New Jersey-based broker-dealer, investment adviser and family of mutual funds (the "Middletown firm").  Antar resides in New York, New York.

12.     Antar pled guilty in 2013 to an Information charging him with federal wire fraud in connection with a "joint venture to purchase and profit from the resale of electronic equipment and then divert those funds for his personal use."  He was sentenced to twenty-one months in prison.  Upon his release from prison, he spent three years on supervised release, which ended on or about June 2018.

## FACTS

### I.     Antar Begins to Solicit Investments in Pre-IPO Shares

13.     Antar began marketing the products and services of the Middletown firm in late 2017.  In December 2018, Antar was furloughed from the Middletown firm.

14.     Starting around the time he was furloughed, Antar began promoting his investment scheme involving pre-IPO shares to friends, friends-of-friends and acquaintances, including some he had knowns for decades.

15.     Specifically, Antar told his investors that he had identified individuals who held pre-IPO shares and wanted to sell them, and others who wanted to buy the pre-IPO shares.  If the investor provided money for Antar to purchase a block of shares, Antar falsely claimed he would purchase and then quickly resell them, and share the profits with the investors within a few weeks.

4

16.     The investment agreements between Antar and the investors were securities. Investors were promised returns based on Antar's efforts and their investment funds were pooled in Antar's personal bank account.  The securities took several forms, including:

a.   By a contract:  Antar executed a contract by which the investor loaned Antar funds to buy the pre-IPO shares, and by which Antar agreed to sell the shares and repay the investment plus a profit.

b.   By a joint partnership agreement:  Antar and the investor signed a joint partnership agreement, giving each a partnership interest proportionate to the investment in Antar's limited liability company, Jar Ventures LLC ("Jar Ventures"), which purportedly held the pre-IPO shares.

c.   By a promissory note:  Antar executed a promissory note and told the investor he would use the money to buy a block of pre-IPO shares that he would immediately sell and return the investor's money plus a portion of the profits.

d.   By a roll-over addendum to an existing agreement:  Antar executed an addendum to an existing agreement or contract with investors who rolled their initial investment and profits into a second (or third) transaction in more or different pre-IPO shares, promising a greater return upon sale of the new shares.

17.     Induced by Antar's representations, investors in this District and elsewhere gave Antar checks or transferred money into his personal bank account, where investor money was pooled for the purported purpose of buying pre-IPO shares.

18.     Based upon Antar's representations, investors in this District and elsewhere had a reasonable expectation of profits based upon Antar's efforts to buy and resell the pre-IPO shares.

II.     **Antar Misappropriates Investor Funds**

19.     Antar never bought pre-IPO shares or any other securities with the funds.  Instead,

except for some Ponzi-like payments to early investors to induce them to invest more money

with him, Antar redirected the investment funds for his own use, which Antar did not mention to

investors.  For example:

      a.   In February 2019, investors sent $246,000 to Antar's bank account, from

          which he paid out $64,000 to other investors, $63,000 to an entity that collects

          casino debts, $30,000 to a catering company, and $11,000 to a family

          member.

      b.   In March 2019, investors sent $106,000 to Antar's bank account, of which he

          used $70,000 to pay down casino debts.

      c.   In April 2019, investors sent $110,500 to Antar's bank account of which he

          used $15,000 to pay an investor and $60,000 to pay down casino debts.

20.     Most of the investors' money was used for Antar's gambling activities.  Between

January and mid-April 2019, on thirty-one days, Antar visited at least one casino in Atlantic

City, New Jersey, spending hundreds of hours at gaming tables and slot machines.  In addition,

during the same fourteen-week period, Antar placed at least 41,712 on-line bets.

III.    **Antar Defrauded Numerous Investors**

21.     Antar knowingly or recklessly engaged in the above-mentioned fraudulent

conduct and misappropriated at least $550,000 from his individual investor victims, including,

but not limited to, the following:

*Investor A*

22.     Investor A, who had known Antar since childhood, wired $100,000 to Antar's personal bank account in April 2019 based on Antar's material representation that he would buy pre-IPO shares of Slack Technologies, Inc. ("Slack") and return her investment plus twenty percent profit.  Investor A sent her $100,000 investment to Antar over a two-day period; on those same days, Antar sent an earlier investor (Investor E) $15,000, and paid $60,000 to an entity that collects casino debts.

23.     When the time came to receive her returns in mid-April, Investor A, a single mother who was saving up for a down payment for her first home, instead rolled the investment forward and added $50,000, based on Antar's assurance that her $150,000 total investment would balloon to $313,400.  Within a week of receiving the additional money, Antar took a trip to an Atlantic City casino, where he gambled away Investor A's funds.

24.     By May 2019, Investor A had not received her investment money back from Antar as he had promised.  Investor A repeatedly called and texted Antar in May, June and July 2019 asking him to return her investment money.  Antar did not reply until July 2019, when he responded by text:  "I'm sorry for all that's been going [on.] But I'll make everything right soon."  Investor A was never repaid.

*Investor B*

25.     Investor B was referred to Antar by a community member.  In early 2019, Investor B invested $75,000, based upon Antar's material representation that he would use the money to purchase pre-IPO shares of Lyft, Inc. ("Lyft").  A few weeks later, Investor B received back $100,000, purportedly in return of investment and profits, as Antar had promised.

26.     In March 2019, Investor B gave Antar another $100,000 to invest in pre-IPO

shares of Slack, which Antar told him would earn a profit of $25,000 to $30,000 upon resale.  In

late March 2019, when the time came to return the investment funds and profits from the Slack

transaction, Antar offered Investor B the opportunity to roll the investment forward into pre-IPO

shares of Uber Technologies, Inc. ("Uber"), with a promise of additional profits.  Investor B

agreed, and added $105,000 to the investment.  Thereafter, Antar stopped responding to Investor

B's calls and texts.

27.     Antar cashed Investor B's $100,000 check from early March 2019, which he told

Investor B would be used to purchase pre-IPO shares of Slack.  In the following week, Antar

gambled at an Atlantic City casino.

*Investor C*

28.     Investor C met Antar through a neighbor. Investor C invested $100,000 with

Antar in February 2019, based upon Antar's material representation that he would buy pre-IPO

shares of Uber.  Antar told Investor C that he would return the $100,000 plus $15,000 in profits

from the sale of the Uber shares within the week.  On the same day Antar received Investor C's

funds, he paid another investor (Investor D) $48,000 and paid $18,000 to the entity that collects

casino debts.

29.     In early March 2019, Antar gave Investor C a check for $115,000, as promised.

Investor D tried to cash the check three times, but each time it was returned for insufficient

funds.

*Investor D*

30.     Investor D met Antar when they were both in prison. In January 2019, Antar

falsely told Investor D that if he invested in Jar Ventures, Antar would buy pre-IPO shares of

Lyft and Slack, resell them to buyers he had identified, and return Investor D's money plus a portion of the profits.

31.     Based upon Antar's material representation, Investor D bought a $12,500 interest in Jar Ventures and Antar purportedly contributed $50,000. They agreed that after Jar Ventures bought pre-IPO shares of Lyft, Antar would sell them within two weeks, return Investor D's funds, and share the profits in proportion to their contribution to the joint venture: twenty percent for Investor D, and 80 percent for Antar.

32.     The day after receiving Investor D's funds, Antar gambled at a casino. He did not return Investor D's funds within the two weeks specified in the agreement, but he did offer him $5,000. Investor D accepted the money, added another $12,500, and gave Antar the entire $17,500 to invest in more pre-IPO shares in February 2019. Shortly thereafter, Investor D added an additional $10,000 to his investment to buy pre-IPO shares. Within a week of receiving Investor D's new investment money, Antar gambled away the money.

33.     Antar offered Investor D $48,000 as return of his investment and profits in February 2019, or, alternatively, the opportunity to roll that amount investment forward into another investment in pre-IPO shares of Lyft. Investor D agreed to roll the $48,000 forward, and he added an additional $2,000 of new investment. Antar promised a $70,000 return by the first week of March 2019. On the same day Investor D agreed to the rollover and the additional $2,000 investment, Antar paid $38,000 to the entity that collects casino debts.

34.     Instead of returning the promised $70,000 to Investor D, Antar convinced Investor D to roll the investment forward again and promised Investor D a return of $98,000 no later than the third week of March 2019. On the same day that Investor D agreed to roll the investment forward, Antar gambled online and at a casino. Antar reneged on the promised

payment to Investor D, providing a host of excuses including that Antar had car trouble, or was ill, or was otherwise unable to make the payment as promised.

35.     In May 2019, Antar sent Investor D a check as partial repayment of his investments of $37,000.  Antar's check was returned for insufficient funds.

*Investor E*

36.     Investor E had known Antar for decades.  In November 2018, Antar falsely told Investor E that he had been paid by the Middletown firm with $100,000 worth of pre-IPO shares of Uber.  Antar further told Investor E that he needed cash immediately and the shares were restricted from trading until Uber's initial public offering in May 2019.  Antar offered Investor E a fifty percent interest in Jar Ventures, which Antar said held the Uber shares, in exchange for $50,040.  Based upon Antar's material representation, Investor E made the investment.

37.     Antar showed Investor E paperwork Antar had falsified indicating that Jar Ventures held pre-IPO shares of Uber.  Within a week of signing the agreement giving Investor E a fifty percent interest in Jar Ventures, Antar gambled at an Atlantic City casino.  Investor E never recovered his $50,040, nor did he receive any shares of Uber.

38.     Between November 2018 and April 2019, Investor E invested several more times with Antar in what he believed were pre-IPO shares of Slack, Juul Labs, Inc. and Casper Sleep Inc. For the Slack investment, Investor E sent Antar $12,000 based on Antar's promise of $25,000 returns.  Investor E did not receive the promised returns, but he did get back his $12,000 investment.  In another transaction, Investor E invested $5,000 with Antar to buy pre-IPO shares and received back the $8,000 Antar promised.

39.     In March 2019, after Investor D had contacted Investor E and other investors to warn them that Antar was engaged in fraud, Investor E confronted Antar.

10

40.     In April 2019, Antar sent Investor E a check for $25,000 in partial repayment of his investment in Jar Ventures.  Antar's check was returned for insufficient funds.

*Investors F and G*

41.     Investor F is an accountant, and Investor G is Investor F's son.  In January 2019, Antar told Investor F he needed money, and to raise cash Antar offered to sell him an interest in Jar Ventures, which he claimed owned pre-IPO shares of Uber.

42.     Based upon Antar's material representation, Investor F paid $4,500 for a three percent interest in Jar Ventures.  Investor G bought a six percent interest in Jar Ventures for $6,000.  The investors did not expect to get any return on their investment until Uber's initial public offering in May 2019, when they understood Jar Ventures would sell the shares and pay out their interests in cash.  However, neither investor received any return or refund of their investment money even after Uber started trading publicly.

43.     Also in January 2019, Antar sought $3,500 from Investor F, telling Investor F that he could buy pre-IPO shares of Juul Labs, Inc., resell them quickly to a buyer he already had identified, and return Investor F's investment funds plus $1,500.  Investor F invested $3,500 with Antar, and within a month received back $5,200, which was $200 more than Antar had promised.

44.     In March 2019, Investor F again invested with Antar, this time giving him $7,500 based on Antar's promise of buying, then selling, pre-IPO shares and returning $8,900 within a few weeks.  On the same day he received Investor F's funds, Antar gambled at an Atlantic City casino.  Investor F has been unable to contact Antar since then.

## FIRST CLAIM FOR RELIEF
### Violations of Section 10(b) of the Exchange Act
### and Rule 10b-5

45.     The Commission realleges and incorporates by reference paragraphs 1 through 44 of this Complaint.

46.     By virtue of the foregoing, Antar, directly or indirectly, by the use of the means and instrumentalities of interstate commerce or of the mails, in connection with the purchase or sale of securities, knowingly or recklessly, employed devices, schemes, or artifices to defraud, made untrue statements of material fact and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, and engaged in acts, practices, and courses of business which operate or would operate as a fraud or deceit.

47.     By virtue of the foregoing, Antar violated, and unless restrained and enjoined will continue to violate, Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)], and Rule 10b-5 [17 C.F.R. § 240.10b-5], promulgated thereunder.

## SECOND CLAIM FOR RELIEF
### Violations of Section 17(a) of the Securities Act

48.     The Commission realleges and incorporates by reference paragraphs 1 through 44 of this Complaint.

49.     By virtue of the foregoing, in the offer or sale of securities, by the use of the means or instruments of transportation or communication in interstate commerce or by use of the mails, directly or indirectly, Antar knowingly, recklessly or negligently: (a) employed devices, schemes or artifices to defraud; (b) obtained money or property by means of an untrue statement of a material fact or omitted to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or (c)

engaged in transactions, practices or courses of business which operate or would operate as a fraud or deceit upon the purchaser.

50.     By reason of the conduct described above, Antar, directly or indirectly violated and, unless enjoined will again violate, Securities Act Section 17(a) [15 U.S.C. § 77q(a)].

## PRAYER FOR RELIEF

**WHEREFORE**, the Commission respectfully requests that the Court grant the following relief:

### I.

Permanently restraining and enjoining Antar from any future direct or indirect violations of Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)], and Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)], and Rule 10b-5 [17 C.F.R. § 240.10b-5] issued thereunder;

### II.

Ordering Antar to pay a civil money penalty pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)], and Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)];

### III.

Ordering Antar to disgorge ill-gotten gains he obtained as a result of the violations alleged in the Complaint, and ordering him to pay prejudgment interest thereon;

### IV.

Granting such other and further relief as the Court may deem just and proper.

## JURY DEMAND

The Commission demands a trial by jury.

Dated: New York, New York
      December 17, 2019

                     Respectfully submitted,

By: _____
       Marc P. Berger
       Lara S. Mehraban
       Thomas P. Smith Jr.
       Richard Hong
       Alix Biel
       Attorneys for Plaintiff
       SECURITIES AND EXCHANGE
       COMMISSION
       New York Regional Office
       200 Vesey Street, Suite 400
       New York, New York 10281-1022
       (212) 336-0956 (Hong)
       Email: hongr@sec.gov